**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 19-1075** (McDowell County 18-F-61)

**Charles Hassel Kennedy,**
**Defendant Below, Petitioner**

**FILED**

**March 23, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Charles Hassel Kennedy, by counsel Thomas H. Evans, III, appeals the October 25, 2019, order of the Circuit Court of McDowell County convicting petitioner of first-degree murder and sentencing him to imprisonment in the penitentiary for life with mercy. Respondent State of West Virginia, by counsel Lara K. Bissett, filed a response in support of the circuit court's order. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

On December 22, 2017, Emily Nichole Hatfield ("the victim") died from a single gunshot wound to her head. At the time of her death, she was in the home she shared with petitioner, her long-time boyfriend, in Raysal, West Virginia. Petitioner called 911 at 4:37 p.m., reporting that the victim had been shot. The Raysal Fire Department, the McDowell Ambulance Authority, and the West Virginia State Police were dispatched to the scene.

Emergency responders with the fire department and ambulance authority arrived first, locating the victim in the living room. She was deceased, lying on her back on a mattress with her legs curled underneath her and her arms splayed out at her sides. Petitioner was covered in blood and yelling, "Help her" and "She's dead." The emergency responders described petitioner as "pacing" and "hysterical," which caused them to fear for their safety and prompted them to ask 911 to dispatch a police officer to the home. Bradshaw Police Officer Nicholas Bailey was dispatched, and, upon his arrival, he detained petitioner in his cruiser.

1

West Virginia State Police Senior Trooper J.A. Tupper and another trooper arrived at the scene at 5:27 p.m. A third trooper arrived shortly thereafter. All three troopers investigated the shooting by taking photographs and measurements inside the home; by collecting evidence at the scene, including a bag of a green leafy substance consistent with marijuana, a bag of a crystal-like substance consistent with methamphetamine, and fourteen strips of Suboxone; and by swabbing the victim and petitioner for gunshot residue. The troopers discovered a Taurus .38 Special revolver underneath the victim, lying between the victim's back and the mattress. The revolver contained one spent shell casing and one unfired round.

While the troopers investigated the scene, Petitioner made several different statements to explain the shooting. Petitioner claimed that the victim was shot when the gun, which he said was underneath a pillow, accidentally went off as the victim rolled over on the mattress. The troopers found no bullet holes in the mattress or in the bedding. Petitioner also claimed that someone had broken into the home and shot the victim. The troopers found no evidence of a forced entry.

Trooper Tupper believed, based on petitioner's highly erratic behavior, that petitioner may have been experiencing a drug overdose. Upon completing his investigation at the home, Trooper Tupper drove petitioner to Welch Community Hospital to obtain a "medical clearance" before attempting to take a statement from him. Petitioner was admitted to the hospital at 9:21 p.m., and Trooper Tupper sat with petitioner during the examination at the hospital. Petitioner was treated for an upper respiratory infection and an abrasion to his forehead, and he was discharged from the hospital shortly after 11:40 p.m. Trooper Tupper then drove petitioner directly to the West Virginia State Police detachment in Welch, which was a five to seven-minute drive from the hospital. The drive took them past the magistrate court, and Trooper Tupper observed a lack of vehicles in the magistrate parking area, which he believed indicated that no magistrate was on duty.

Upon arriving at the Welch detachment, Trooper Tupper secured evidence. Thereafter, he told petitioner that petitioner was under arrest for the murder of the victim and read petitioner his *Miranda* rights. He also directed petitioner to complete a DPS Form 79, indicating that petitioner understood his rights and that he was under arrest. The pre-interview section of the form contained three lines, with spaces to the left of each line for a suspect to place his or her initials. Those three lines appeared on petitioner's form as follows:

> You are under arrest for the crime of: <u>Murder</u>
> You are being questioned in regard to the crime of: <u>Murder</u>
> You are not under arrest and are free to leave at any time.

Petitioner placed his initials next to each of these three lines, despite having been informed by Trooper Tupper that he was under arrest.

Trooper Tupper started an interrogation of petitioner at 1:07 a.m. that was audio recorded. Petitioner's explanation as to how the victim was shot changed throughout the interrogation. First, petitioner stated that he heard the revolver fire as he returned from the bathroom. He then indicated that he bumped a chair on which the revolver sat and that the revolver fired upon falling from the chair. Finally, petitioner said that he bumped a chair on which the revolver sat, causing the revolver to fall, and it fired as he tried to grab it. The interrogation ended at 2:35 p.m.

2

Shortly after the first interrogation ended, a second recorded interrogation began. During the second interrogation, petitioner gave another explanation for how the shooting occurred: Petitioner claimed the gun fired as he was removing it from the pocket of his pants. Throughout both interrogations, petitioner maintained that the shooting was an accident and that he and the victim had not been fighting before the shooting. Petitioner also asserted that he had been firing "+P" earlier in the day of the shooting or the day before the shooting.[1] At the conclusion of the second interrogation, Trooper Tupper processed petitioner and prepared a criminal complaint. Sometime thereafter, petitioner was presented to a magistrate.

On June 19, 2018, petitioner was indicted for the first-degree murder of the victim. Leading up to petitioner's trial on the charge, the circuit court held a suppression hearing and a *McGinnis* hearing[2] to consider whether certain evidence would be admissible at petitioner's trial.

At the suppression hearing, the circuit court considered petitioner's motion to suppress the statements he made during the two recorded interrogations. Petitioner argued that his statements were not made voluntarily due to intoxication and that they were obtained in violation of his prompt presentment right. Testing on specimens obtained from petitioner at the Welch Community Hospital revealed that petitioner had numerous controlled substances in his system on the night of the shooting, including cocaine, methamphetamine, amphetamine, barbiturates, benzodiazepine, and marijuana. Petitioner received a CT scan for "head trauma" while at the hospital; however, the results of the scan showed "[n]o large areas of hemorrhage" and "[n]o extra-axial fluid collections," and he required no further treatment or monitoring for his head injury. The circuit court heard testimony from Trooper Tupper concerning the interrogations and his decision to take petitioner to the hospital prior to the interrogations. Trooper Tupper was questioned as follows:

> Q [Petitioner's counsel]    So would you -- is it fair to say that the purpose of seeking medical clearance was so that you could take a statement from [petitioner] and have it be something that would -- was that -- would that be the purpose of that -- of that delay?

---

[1] "+P" refers to ammunition that contains a higher amount of gun powder than standard ammunition.

[2] *See* Syl. Pt. 2, in part, *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994) ("Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence."

A [Trooper Tupper]     Yeah, that would be part of it, to make sure they're not overdosing or some other kind of physical danger going on to their well-being.

The circuit court also listened to the interrogations in their entirety.

On September 4, 2019, the circuit court entered an order denying petitioner's motion to suppress the statements. The circuit court observed that, although petitioner was upset and sometimes excited during the interrogations, he was alert, oriented, and able to provide detailed information including his name, birth date, social security number, address (excluding zip code), the date, the location of the victim and various pieces of furniture in his house, and the events leading up to and following the shooting. The circuit court found, under the totality of the circumstances, that petitioner's statements in both interrogations were voluntary; however, the circuit court determined that certain questions and responses concerning prior charges against petitioner, petitioner's drug use, petitioner's history of fighting with the victim, and Trooper Tupper's thoughts about petitioner's veracity should be excluded under Rules 403 and 404 of the West Virginia Rules of Evidence.[3] The circuit court redacted the transcript of the two interrogations and provided the redacted transcript to the parties for their use at trial.

The circuit court also determined that the interrogations were not conducted in violation of petitioner's prompt presentment right. The circuit court found that directly after petitioner was taken into police custody, the troopers secured and processed the crime scene, and that immediately following this process, petitioner was transported to the hospital to ensure his wellbeing. The circuit court further found that because Trooper Tupper did not observe any vehicles in the magistrate court parking area, "a magistrate likely would have been unavailable." The circuit court determined that the time that passed between petitioner being taken into custody and giving his statements was justifiable. The circuit court concluded that the interrogations were admissible at trial.

At the *McGinnis* hearing, the circuit court considered the admissibility of an alleged prior instance of domestic violence involving the victim and petitioner under Rule 404(b) of the West Virginia Rules of Evidence. The circuit court heard testimony from the victim's sister and Trooper Matthew Shifflette who indicated that on May 7, 2016, in Wyoming County, petitioner was arrested and charged with domestic assault for threating the victim with the same Taurus .38

---

[3] Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." W.Va.R.Evid. 403.

Rule 404(a), except in limited circumstances, prohibits the admission of "[e]vidence of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait." W.Va.R.Evid. 404(a). Rule 404(b) prohibits the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" except where the evidence is admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." W.Va.R.Evid. 404(b).

4

Special revolver involved in her death. The victim's sister testified that, during the incident, petitioner held the revolver to the victim's pregnant belly and asked the victim, "How much do you love me?" Trooper Shifflette explained that the case against petitioner was dropped at the victim's request. Two orders were entered by the Circuit Court of Wyoming County dismissing the case against petitioner. Both orders stated the dismissal was "due to the Investigating Officer and victim not wishing to pursue the charge," although Trooper Shifflette testified he never indicated to that court that he did not wish to pursue the charge.

By order entered on August 15, 2019, the circuit court found that the testimony of the victim's sister and Trooper Shifflette was credible, that the incident occurred as described by these witnesses, that the incident was relevant to petitioner's murder case, and that the evidence was more probative than prejudicial by showing lack of accident or mistake, motive, preparation and plan. The circuit court decided that evidence of the incident would be admissible at petitioner's trial under Rule 404(b).

Petitioner's trial commenced on September 9, 2019. The State presented testimony from various individuals who responded to the scene on the evening of December 22, 2017. Petitioner's call to 911 was played, in which petitioner repeatedly stated, "I'm sorry" and "I love you." The State also presented evidence through various forensic experts who testified that gunshot residue was found on petitioner's hands and that the Taurus .38 Special revolver "was operable as received based on no problems being encountered during examination and test firing under laboratory conditions." Dr. Allen Ray Mock, the chief medical examiner for West Virginia, testified that the victim's wound was a "classic . . . tight-contact-range entrance gunshot wound," indicating that the muzzle of the revolver was in contact with the victim's head when the revolver discharged. The trajectory of the bullet in the victim's head was front to back, slightly left to right, and downward, and the bullet did not exit the victim's skull. Dr. Mock characterized the shooting as a homicide. The victim's toxicology report showed the presence of controlled substances including methamphetamine and buprenorphine. It was noted at trial that the victim had been experiencing gallbladder issues in the week before her death and that petitioner had taken her to the hospital for these issues. The State presented evidence of the May 7, 2016, Wyoming County incident through testimony of the victim's sister and Trooper Shifflette.

At trial, petitioner again asked that the circuit court suppress the two recorded interrogations. The circuit court refused the request and gave petitioner the option of proceeding with the admission of either the redacted transcripts or the recordings in their entirety. Petitioner chose to proceed with the entire recordings to allow for more complete cross-examination of Trooper Tupper. The circuit court told the jury:

> Now, you're about to hear a statement. Actually, it's more an interrogation than a statement, and for that reason, when we had a prior hearing, there were large parts of it that I chose to redact.
> . . . .
> But I tried to remove -- which we've got a written copy of this -- all that I thought was more prejudicial than it was probative value. But I asked the defendant, you know, we can either read the parts that are left or we can play it as is, and he

5

chose to -- he wanted to play it as is, because I guess he wanted you to hear everything.

The recordings of the interrogations were played for the jury.

Petitioner chose not to testify during the trial. He called two witnesses to testify: a forensic consultant specializing in firearms, ballistics, and shooting reconstruction, and petitioner's aunt. The forensic consultant, Ronald Scott, testified that he did not examine the physical evidence, such as the revolver, but that he examined the reports prepared by the State's expert witnesses. Mr. Scott stated that the victim's wound indicated that the revolver was in tight or loose contact with her head when it discharged. Mr. Scott concluded that the revolver would have only fired if pressure were applied to the trigger, but that the necessary pressure could have been applied accidentally. Petitioner's aunt testified that she was aware of attempted break-ins at petitioner's home.

On September 12, 2019, after deliberating for approximately fifty minutes, the jury returned its verdict, finding petitioner guilty of first-degree murder. Upon the presentation of additional evidence the following day, the jury recommended mercy. The circuit court entered an order on September 19, 2019, sentencing petitioner to imprisonment in the penitentiary for life with a recommendation of mercy.

Petitioner filed a motion for post-verdict judgment of acquittal, arguing that the evidence presented during the trial was insufficient to sustain his conviction. That same day, petitioner also filed a motion for a new trial, asserting that the circuit court erred by admitting the recorded interrogations during the trial and by admitting evidence of the Wyoming County incident during the trial. The motion for a new trial also claimed that the evidence presented was insufficient to sustain petitioner's conviction. The circuit court entered an order denying the motions on October 25, 2019. The circuit court refused to disturb its prior rulings concerning the recorded interrogations and the Wyoming County incident, and the circuit found that substantial evidence had been presented to support petitioner's conviction.

Petitioner now appeals the October 25, 2019, order denying his post-trial motions for judgment of acquittal and a new trial. We have held that

> [t]he trial court's disposition of a motion for judgment of acquittal is subject to our *de novo* review; therefore, this Court, like the trial court, must scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt.

*State v. LaRock*, 196 W. Va. 294, 304, 470 S.E.2d 613, 623 (1996). Regarding the review of a circuit court's order denying a motion for a new trial, we have held:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit

6

court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

Through his first assignment of error, petitioner argues that the circuit court erred by admitting evidence of the Wyoming County incident under Rule 404(b) of the West Virginia Rules of Evidence. Petitioner asserts that evidence of the Wyoming County incident was "irrelevant, not probative, and also unfairly prejudicial" because the "prior, alleged crime [] was dismissed on the merits . . . nineteen months prior to the current events in the case in chief against" petitioner. Our review of a circuit court's admission of evidence under Rule 404(b) has three steps.

First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the 'other acts' evidence is more probative than prejudicial under Rule 403.

*LaRock*, 196 W. Va. at 310-11, 470 S.E.2d at 629-30. Ultimately, "we review the trial court's decision to admit evidence pursuant to Rule 404(b) under an abuse of discretion standard." *State v. McGinnis*, 193 W. Va. 147, 159, 455 S.E.2d 516, 528 (1994). "In reviewing the admission of Rule 404(b) evidence, we review it in the light most favorable to the party offering the evidence, in this case the prosecution, maximizing its probative value and minimizing its prejudicial effect." *Id.*

Upon our examination of the record, we find the circuit court committed no clear error in determining that there was sufficient evidence to show that the Wyoming County incident occurred as described by the victim's sister and Trooper Shifflette. Although the domestic assault charge arising from the Wyoming County incident was dismissed at the request of the victim (and possibly also Trooper Shifflette), the dismissal of the charge under that circumstance did not, as petitioner contends, constitute an adjudication on the merits of the charge. The orders of the Circuit Court of Wyoming County did not evaluate the facts underlying the charge, nor did the orders contain any language indicating that the dismissal constituted an adjudication on the merits of the charge. Accordingly, petitioner's position that the dismissal constituted an adjudication on the merits is simply incorrect. Even if petitioner was correct, we have held that "[t]he fact that a criminal charge against a defendant is dismissed or that he/she is acquitted of the same does not prohibit use of the incident under Rule 404(b) of the West Virginia Rules of Evidence." Syl. Pt. 4, *State v. Mongold*, 220 W. Va. 259, 647 S.E.2d 539 (2007).

We need not linger on the second step of our review as petitioner makes no argument that evidence of the Wyoming County incident was not admissible for a legitimate purpose. Upon our de novo review, we find that the evidence was admissible for the legitimate purpose of proving that the shooting was intentional, rather than a mistake or accidental. *See* W.Va.R.Evid. 404(b)(2) (stating that evidence of a crime, wrong or other act may be admissible to prove "absence of mistake, or lack of accident.")

7

The third step of our review requires us to evaluate whether the circuit court abused its discretion in determining that evidence of the Wyoming County incident was more probative than prejudicial under Rule 403 of the West Virginia Rules of Evidence. Rule 403 allows a court to exclude relevant evidence if it is more prejudicial than probative. *See* W.Va.R.Evid. 403. Petitioner asserts that evidence of the incident was irrelevant, not probative, and unfairly prejudicial because the incident occurred nineteen months before the victim's death and because there was no evidence of relationship discord between the victim and petitioner directly prior to the shooting. We find no merit to petitioner's argument.

Evidence of the Wyoming County incident was highly relevant and probative at petitioner's trial because, as the circuit court found, the incident was of a domestic nature and the same revolver was involved in the incident and the victim's death. While the incident occurred more than a year before the victim's death, the remoteness of the incident "goes to the weight . . . accorded the evidence by the jury, rather than to admissibility." Syl. Pt. 6, in part, *State v. Gwinn*, 169 W. Va. 456, 288 S.E.2d 533 (1982); *see also State v. McIntosh*, 207 W. Va. 561, 573, 534 S.E.2d 757, 769 (2000) ("[R]emoteness, or the temporal span between a prior crime, wrong, or other act offered as evidence under Rule 404[(b)] and a fact to be determined in a present proceeding, goes to the weight to be given to such evidence and does not render the evidence of the other crime, wrong, or act irrelevant and inadmissible." (quoting *State v. Schaaf*, 449 N.W.2d 762, 772 (1989)). We have held that "[w]hether evidence offered is too remote to be admissible upon the trial of a case is for the trial court to decide in the exercise of a sound discretion[.]" Syl. Pt. 5, in part, *Yuncke v. Welker*, 128 W. Va. 299, 36 S.E.2d 410 (1945). In this instance, we find that evidence concerning the incident was not so remote that it was immaterial. *See McIntosh*, 207 W. Va. at 573, 534 S.E.2d at 769 (listing cases in which courts found evidence admissible despite temporal spans of more than eleven years, thirteen years, and seven to eight years). The Wyoming County incident bears directly on petitioner's relationship with the victim and whether discord did, in fact, exist in their relationship, making the evidence highly relevant and more probative than prejudicial. The circuit court did not abuse its discretion by giving the jury the opportunity to consider this evidence and to afford it the proper weight. Accordingly, we conclude that the circuit court did not abuse its discretion by admitting evidence of the Wyoming County incident pursuant to Rule 404(b) at petitioner's trial.

Through four separate assignments of error, petitioner argues that the circuit court erred by admitting the recordings of petitioner's interrogations at his trial. Petitioner avers that the interrogations should have been suppressed because they were obtained in violation of his prompt presentment right, because they were not made voluntarily due to his severe intoxication and head trauma, because he was forced to choose between testifying and presenting the entire interrogations, and because they were full of inaccuracies and misrepresentations by Trooper Tupper.

We have held that "[o]n appeal, legal conclusions made with regard to suppression determinations are reviewed *de novo*. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference." Syl. Pt. 3, *State v. Stuart*, 192 W. Va. 428, 452 S.E.2d 886 (1994). Additionally, we have held:

When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

Syl. Pt. 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

First, we consider petitioner's argument that the statements he made during the recorded interrogations were obtained in violation of his prompt presentment right. The prompt presentment right as set forth in West Virginia Code § 62-1-5(a)(1) (1997) and Rule 5(a) of the West Virginia Rules of Criminal Procedure requires that a defendant be presented to a magistrate following arrest "without unnecessary delay." The rule "is triggered when an individual is either arrested or taken into police custody with sufficient probable cause to warrant an arrest." *State v. Wickline*, 184 W. Va. 12, 15, 399 S.E.2d 42, 45 (1990) (citing Syl. Pt. 2, *State v. Humphrey*, 177 W. Va. 264, 351 S.E.2d 613 (1986)). We have held that an inculpatory statement obtained in violation of the prompt presentment right is inadmissible when "it appears that the primary purpose of the delay was to obtain a confession from the defendant." *Wickline*, 184 W. Va. at 13, 399 S.E.2d at 43, Syl. Pt. 2, in part (quoting Syl. Pt. 1, *State v. Guthrie*, 173 W. Va. 290, 315 S.E.2d 397 (1984)). We have explained that "[t]he delay between the time of the arrest or custodial interrogation and the giving of a confession is most critical for prompt presentment purposes because during this time period custodial confinement and interrogation can be used to attempt to produce a confession." *Wickline*, 184 W. Va. at 13-14, 399 S.E.2d at 43-44, Syl. Pt. 4; *see also Humphrey*, 177 W. Va. at 269, 351 S.E.2d at 617-18 ("Under our prompt presentment rule, the significant time period when an accused is in police custody is the time between the arrest or the time probable cause exists to arrest and the time a statement is obtained from the accused."). "[T]he proper focus in prompt presentment cases is on delay which precedes a confession." *State v. Judy*, 179 W. Va. 734, 739, 372 S.E.2d 796, 801 (1988).

There is no precise definition of what constitutes an unreasonable delay for prompt presentment purposes. *See State v. Persinger*, 169 W. Va. 121, 135, 286 S.E.2d 261, 270 (1982) ("Courts have recognized that whether there has been an unreasonable delay in taking an arrested person before a magistrate is not subject to any precise time period."). Further, some delays in presenting an individual to a magistrate are justifiable. For instance, in *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995), we stated that "delays in the transportation of a defendant to the police station, completion of booking and administrative procedures, recordation and transcription of a statement, and the transportation of a defendant to the magistrate do not offend the prompt presentment requirement." *Id.* at 395-96, 456 S.E.2d at 476-77 (footnote omitted). In *Persinger*, we recognized that a delay necessary for "performing customary booking and administrative procedures" is also permissible. 169 W. Va. at 135, 286 S.E.2d at 270. Such procedures may include the time needed "to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value." *Id.* at 136, 286 S.E.2d at 270 (quoting *Johnson v. State*, 384 A.2d 709, 717 (1978)). In that same vein, we said, "Obviously, where the arrested person is in need of medical attention, a delay occasioned by this fact cannot be deemed unreasonable." *Id.* at 136 n.14, 286 S.E.2d at 270 n.14.

Here, petitioner argues that his prompt presentment right was violated by the delay resulting from being transported to the hospital and then from the hospital to the police detachment, rather than being presented immediately to a magistrate upon leaving the scene of the shooting. He claims that the purpose for the delay was to obtain a statement from him. Upon our review of the record, we find that the complained-of delay was reasonable and justified under the totality of the circumstances and that the purpose of the delay was not to obtain inculpatory statements from petitioner. Numerous witnesses testified to petitioner's erratic behavior at the scene of the shooting, the officers found a bag of a crystal-like substance consistent with methamphetamine in petitioner's home, and Trooper Tupper stated that he believed petitioner may have been experiencing an overdose. Trooper Tupper's belief that petitioner was in need of medical attention was reasonable under these circumstances, and the time spent transporting petitioner to the hospital was justified. Similarly, the time petitioner spent at the hospital being evaluated and treated was justified. To the extent that petitioner argues that the time between when he left the hospital and when the interrogations began constituted an unjustifiable delay, we disagree. The drive from the hospital to the detachment took fewer than ten minutes, and Trooper Tupper spent a reasonable amount of time securing the evidence from the scene before beginning the interrogation. Under the specific facts of this case, it is clear that the primary purpose of the delay was not to obtain inculpatory statements from petitioner and that any delay was justified. Consequently, we conclude that the circuit court did not err in denying petitioner's motion to suppress the recorded interrogations on prompt presentment grounds.

Next, we consider petitioner's argument that the statements he made during the recorded interrogations were not made voluntarily due to his severe intoxication and head trauma. We have held that for inculpatory statements to be admissible, the State must prove, by at least a preponderance of the evidence, that the statements were voluntary. *See* Syl. Pt. 5, *State v. Starr*, 158 W. Va. 905, 216 S.E.2d 242 (1975). ("The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case."). When evaluating whether the inculpatory statements were voluntary, "a determination must be made as to whether the defendant knowingly and intelligently waived his constitutional rights and whether the [statements were] the product of an essentially free and unconstrained choice by [their] maker." Syl. Pt. 7, in part, *State v. Bradshaw*, 193 W. Va. 519, 457 S.E.2d 456 (1995). We have recognized that "[a] claim of intoxication may bear upon the voluntariness of a defendant's confession, but, unless the degree of intoxication is such that it is obvious that the defendant lacked the capacity to voluntarily and intelligently waive his rights, the confession will not be rendered inadmissible." Syl. Pt. 1, *State v. Hall*, 174 W. Va. 599, 328 S.E.2d 206 (1985).

When evaluating the voluntariness of a defendant's statement on appeal, this Court has held that "[a] trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syl. Pt. 3, *State v. Vance*, 162 W. Va. 467, 250 S.E.2d 146 (1978). We have further held that "[t]his Court is constitutionally obligated to give plenary, independent, and de novo review to the ultimate question of whether a particular confession [or statement] is voluntary and whether the lower court applied the correct legal standard in making its determination." *State v. Guthrie*, 205 W. Va. 326, 340, 518 S.E.2d 83, 97 (1999) (quoting Syl. Pt. 2, in part, *State v. Farley*, 192 W. Va. 247, 452 S.E.2d 50 (1994)).

10

In support of his position that his statements were involuntary, petitioner asserts that the evidence shows he gave the statements while he was acting erratically, while his system contained numerous controlled substances, while he was under the influence of said controlled substances, and while he had a head injury that required a CT scan. He states that he initialed the wrong line on the DPS Form 79, and he told Trooper Tupper during the interrogation that he did not know where he was or what he was doing. The circuit court observed that although petitioner was upset and sometimes excited during the interrogations, petitioner was alert, oriented, and able to provide detailed information about himself, his home, and the events surrounding the shooting. Furthermore, petitioner's medical records do not indicate that he suffered from severe intoxication or injury. Petitioner was read his *Miranda* rights, he acknowledged he understood those rights, and he decided to speak to Trooper Tupper anyway. Having considered the evidence presented below and the circuit court's evaluation of the same, we are satisfied that the circuit court properly assessed the voluntariness of petitioner's statements to Trooper Tupper. Under the totality of the circumstances, the circuit court did not err in determining that the statements were voluntary, and the circuit court did not err in denying petitioner's motion to suppress the recorded interrogations on the ground that his statements were involuntary.

We now consider petitioner's argument that the interrogations should have been suppressed because he was forced to choose, in violation of his constitutional rights, between testifying and presenting the entire interrogations. He argues, "[T]he court's decision to unfairly redact the statement so that all that was left was a statement which made the Petitioner appear to be giving misleading statements without providing the misleading, argumentative and downright wrong positions of the Officer's statements was improper and unfairly prejudiced the Petitioner." He argues that under these circumstances, he had no choice but to ask that the entirety of the recorded interrogations be admitted so that the jury could have the proper context for his statements. We find that the circuit court committed no error. Having reviewed the redacted version of the interrogations, we do not find that they remove essential context for petitioner's statements. Thus, we do not find that the circuit court presented petitioner with an unfair or improper choice on which version of the interrogations—the redacted version or the entire version—would be admitted. Petitioner does not cite to any law in support of his argument, nor does he specify what constitutional rights he alleges the circuit court violated. Consequently, we conclude that the circuit court did not err by refusing to suppress the interrogations.

We now turn to petitioner's argument that the interrogations should have been suppressed because they are full of inaccuracies and misrepresentations by Trooper Tupper, which he alleges made the interrogations more prejudicial than probative. He states that while the circuit court redacted the interrogations to remove various misstatements, accusations, and hypotheticals posed by Trooper Tupper during the interrogations, this was improper and ultimately resulted in the violation of his constitutional rights. He asserts that because the interrogations "contained so many improprieties that it required much ink to redact . . . the court should have excluded the entire statement." Again, we find no error. The redacted interrogations do not remove essential context for petitioner's statements, and petitioner has cited to no law in support of his argument on this point. Therefore, we conclude that the circuit court did not err by refusing to suppress the interrogations.

11

Through his final assignment of error, petitioner argues that the circuit court erred by concluding that the evidence presented at his trial was sufficient to sustain his conviction. He states that the evidence demonstrates he was highly intoxicated at the time of the shooting and that there was no evidence of relationship discord between the victim and petitioner directly prior to the shooting. He also reasserts that evidence concerning the Wyoming County incident was improperly admitted.

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). Our law is clear that

> [a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part. With regard to intoxication, the Court has held that

> [v]oluntary drunkenness is generally never an excuse for a crime, but where a defendant is charged with murder, and it appears that the defendant was too drunk to be capable of deliberating and premeditating, in that instance intoxication may reduce murder in the first degree to murder in the second degree, as long as the specific intent did not antedate the intoxication.

Syl. Pt. 2, *State v. Keeton*, 166 W. Va. 77, 272 S.E.2d 817 (1980).

We find no merit to petitioner's argument that the evidence was insufficient to sustain his conviction. The jury heard testimony over five days from fifteen witnesses. Significantly, both Dr. Mock and Mr. Scott testified that the muzzle of the revolver was in contact with the victim's head when she was shot. Dr. Mock testified that under the totality of the circumstances, he believed the shooting was a homicide. Additionally, the victim's sister and Trooper Shifflette testified that petitioner had previously threatened the victim with the same revolver that later caused her death, and Trooper Tupper testified in detail about his investigation of the shooting. Petitioner's phone

12

call to 911, the testimony of the emergency responders, and the recorded interrogations all indicate that petitioner was not so intoxicated that he was incapable of deliberation or premeditation. Therefore, we conclude that the circuit court correctly found that any rational juror could convict petitioner of first-degree murder based on the evidence presented.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** March 23, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton